Good morning, Your Honor. Good morning. May it please the Court, my name is Rebecca Gray. I'm here for Plaintiff and Appellant Sarah Maurer v. ERISA Disability Action v. Appellee Defendant Reliance Standard Life, RSL. As a fiduciary, RSL owed Sarah Maurer the duty of loyalty that's been described as the highest known to law. Counsel, I'm going to sort of cut to the chase, what for me may be the pivot point of my thinking, and that is this nervous mental limitation. In response to my question, I want you to assume that we would apply a high degree of skepticism, which is what you're asking us to do. It seems to me that under pretty much any level of skepticism, the nervous mental limitation would apply here. When you read through Dr. Hines' notes, he's constantly talking about her depression, her stress, her mood, she's taking medications that are for mental and nervous disorders. He reports that he's treating her, counseling her, psychiatric management, etc., etc. Why isn't it perfectly reasonable for that limitation to apply? Thank you for your question. The medical evidence is unequivocal. She has a genetic marker for a rheumatoid arthritis condition, two different arthritic conditions, psoriatic arthritis as well as ankylosis spondylitis. Those conditions are demonstrable on MRI according to her rheumatologist, Dr. Campagna. Those are further indicated and corroborated by the fact that she had a positive response to MPRAL, which is a tumor necrosis factor treatment. The fact that she had a positive reaction to that is supportive of the diagnosis of arthritis. She also had a history of psoriasis. There are a certain number of people with a skin condition of psoriasis that also have a corroborating arthritic condition. The definition of chronic pain necessarily requires depression. It is a diagnostic criterion. Anytime you see a condition of chronic pain, you will see depression with it, and that's not surprising. Stress, mood, depression make pain worse, and pain makes those matters worse. What Dr. Hines was absolutely crystal clear about in the record, communicating with RSL with the limited information he had, was that her medical condition was what was disabling her. And that the mental health references that you, Judge Graber, just referred to were sequelae. They were secondary. They were not causing a disability. Well, that's not the only way to read these medical records, it seems to me, at least as I'm looking at them. I guess the question is, if there are two permissible ways to read these medical records, even with a high degree of skepticism, don't we have to grant the fiduciary the discretion to read them in one of those two reasonable manners? The fiduciary has an obligation to serve the participants and the beneficiaries as fiduciary, obviously. Well, yes, maybe I can be more precise. If there are two equally plausible ways to read medical records, and one of them is in favor of the beneficiary and one isn't, is the fiduciary required, when they're equally plausible, to find in favor of the... Assuming they're equally plausible, finding in favor of the beneficiary? Yes, I would submit... Where does that rule come from? What's your best guess? Well, if you look at MetLife v. Glenn, they talk about, and this is looking at the conflict factor that a court looks at, they consider it a tiebreaker. If the fiduciary has the highest duty under the law, and there are two reasonable interpretations, isn't it the fiduciary's responsibility to administer the plan to the claimant's benefit? Now, when we're looking similarly before the court, the lower court is required to look in terms of evidence of conflict with the lights most favorable to the claimant. Again, MetLife, as a tiebreaker, would require the court not to sanction RSL's abuse of discretion. No, I'm assuming for all these questions that you get your high degree of skepticism, but even with a high degree of skepticism, there are cases in which benefits can and should be denied under the terms of the plan. Absolutely right. Yes. Two issues. First, let's look at how RSL used its discretion. RSL did not think the mental nervous limitation applied to her case. They paid her for four years, not two years, under the mental nervous limitation. The claim supervisor said- So maybe she got more than she deserved, so why does that have to- Because I would posit- Continue in what? Pardon me for interrupting. I would posit to the court that RSL itself didn't think the mental nervous limitation applied. The second is RSL never explained to Ms. Moore before she had a chance to rebut it its basis, its factual basis for the assertion that the mental nervous applied. If you look at the first two denial letters, they are under 900 words. They cite to the mental nervous limitation language, but they don't explain how it applies. Stop paying benefits until the final denial, which clearly and primarily relies on the mental or nervous disorder and explains at some length, at long, exhausting length. So before that, there was not a discontinuation, correct? My point is, after that lengthy recitation of the letter you're looking at, which is 6,000 words as opposed to the 800 words of the previous letters, she didn't have a chance to rebut that information, Your Honor. That was the appeal denial. They gave her that appeal denial, and they slammed the record closed. That is clearly a violation of SAFON. If there is a factual assertion that the mental nervous applies to her, she did not receive a full and fair review on those questions. For the first time, they outlined the reviews of the purported medical reviews of Shoferman Mahawar. The earlier letter in March of 2007 was short, but also was quite clear that the point of it was that in their view, she was physically capable of working at a sedentary occupation, but the mental nervous limitation applied. But they don't say why, Your Honor. They don't explain the rationale. They don't explain the facts that support that. It's simply conclusory. They don't invite her to provide information that will perfect her claim, as they are obligated to under the case law and under the regulations. They simply say, if there's something you have to rebut this provision, we're not going to explain how it applies, we're not going to explain the basis for it, but if there's something you have, please let us know. That's clearly a violation of this court's precedent. I'd like to point out, with respect to the definition of each and every, the RSL's interpretation would essentially require one to be in a vegetative state in order to qualify for disability benefits. By interpreting the definition of disability that is in the policy as permitting a disqualification from disability if one can perform a single material duty, in other words, if somebody can read and write but not do anything else, if a baseball player can throw but can't bat or read signals, or if a doctor can take a medical history but can't do medical procedures. That's absurd. That clearly thwarts the reasonable expectation of the insured. It renders coverage illusory, and the lower court was erroneously a deferential in sanctioning that interpretation. Finally, the court applied the wrong definition. Just like the notice prejudice rule, in Universal's word, California's definition of disability as it applies to insurance policies is saved from preemption. Let me just ask you sort of an order of decision question here. If we were to disagree with you on the nervous mental limitation, would we have to decide any other issues in the case, or could we simply say that was a sufficient ground and we need not decide anything else? Just as a theoretical matter, I know you obviously don't concede any of that. I'm sort of asking as a... Sure, sure. I take your question. I'm thinking, and I'm not sure what the answer is. I think the answer is that that would be sufficient. There are other legal questions with respect to each and every and with respect to California definition. Yeah. Right. I think the answer is yes. I would ask the court to look at the review that the question of the mental nervous received. Dr. Hines invited RSL to contact him when he provided an appeal letter explaining that her disability was physical and not mental, and they refused to contact him. Dr. Campagna outlined the physical medical bases and also was available, and RSL didn't contact her either. RSL didn't communicate with Ms. Moore herself about the presence or absence of mental health issues. Now, with respect to the medications, the record is clear. Ms. Moore was taking what counsel now refers to as psychotropic medications for nerve pain and for sleep, and that's substantiated and explained in my briefing. The other thing I'd like to raise to this court is this is post hoc rationales. Excuse me. Valium and the Zoloft, are those also for sleep? I thought that the Seroquel was the sleep medication. And the Ambien and Sonata, which she stopped using at some point. I'm not real familiar with some of these medications. Well, Buter was stopped in 2004. The Trazodone was prescribed as a sleeping aid. That's an excerpt of record 465. Both the Effexor and the Topamax treat nerve pain. What about Zoloft and Valium? I don't remember those. I don't doubt that they're in the record, and I don't remember when she was taking those. That would influence the... Well, is Zoloft for sleep or is Zoloft for mental state? My personal knowledge is that it's an SSRI. That's what I know about Zoloft. I don't know when she took it or if she took it. But I would just also point out that the references to these medications, it was not ever explained to Ms. Moore. Those are not in the appeal denial. They're not in any of the other denials. These are clever citations selected by counsel. These are lawyer-invented arguments. This is not something RSL came up with during the claim. I would also point out that RSL and the lower court gave short shrift to the clear side effects of the medication. They take the position that Ms. Moore can physically do the duties of an attorney when she's on round-the-clock narcotic pain medication, which she has indicated make her overwhelmingly sick, exhausted, excessive lethargy, excessive sedation, dysphoria, night sweats, forgetfulness. So this is further evidence of RSL's failure to both investigate and fully review the bases for her claim. I say I have about two and a half minutes to go, so I'd like to reserve the balance of my time. You bet. Thank you, Ms. Gray. Thank you. Good morning. Good morning, Your Honors. May it please the Court, Horace Green for FLE Reliance Standard Life Insurance Company. Your Honors, four independent medical examiners, board-certified specialists, all reviewed by an attorney, reviewed Ms. Maurer's medical records. Two of them performed independent medical examinations, hands-on physical evaluations of Ms. Maurer. All four of them came essentially to the same conclusion, which is that Ms. Moore is not solely impaired by any physical condition from performing sedentary work activity. What do you make of Ms. Gray's point that people who have, you know, intractable pain from real physical problems will necessarily also be depressed and have psychological issues with that? Well, I have two responses to that. One is that in the case with respect to Ms. Maurer, Dr. Black's medical records indicated that Ms. Maurer reported having problems with depression dating as far back as when she was in her early 30s. So Ms. Maurer's issues with depression predate the 1988 physical injury, which gives rise to her current physical condition. The second point that I would make to that is the point that another panel of this Court made in Gunn v. Reliance Standard Life Insurance Company, which is that under the mental nervous limitation language in the plan document, there's nothing that says that the disability, that if the psychiatric condition is a sequelae of the physical condition, that that means that the limitation does not apply. That language is not anywhere in the policy. So what I would suggest to the Court as the Gunn v. Reliance Standard Court said was that even if you accept that point, that her depressive disorders, her intercurrent stress sores all stem from her secondary to her pain condition, the mental nervous limitation still applies. The third point that I would make, after I said I was going to only make two, so I apologize to the Court, is that Dr. Hines' records, which we cited in our brief, indicated that, particularly as of October 2002 at the time, that he recommended that she go on disability. It was not the fact that the emotional issues that she had were secondary to her pain condition. What he said in October 2002 was that the intercurrent stressors, her depression, her anxiety, were the things that prevented her from adequately dealing with her pain condition. And it was those intercurrent stressors, having to do with family issues and other issues, unrelated to her physical condition, that combined with her physical condition, in fact, rendered her disabled. Counsel, I'm sorry, I thought you were done with that point. What is your response to counsel's concern about the terseness, if you will, of the initial denial and the second denial, as distinct from the final lengthy explanation? That is, both the initial denial and the second one relied on the mental nervous limitation but did not go into detail. One of them quoted it and said, if you have any of these things, this is what the plan says, and depression is on that list. But they didn't really specifically say, because Dr. So-and-so said thus and such. Is that an error, and if so, what do we do about it? I don't believe so, Your Honor, and here's why. As we documented in our papers, there was dialogue back and forth between the parties. The first letter references the mental nervous limitation. After that first letter, there was discussion in the record between the claims examiner for Reliance Standard and Mrs. Maurer's husband, Mr. Johnson, relating to the mental nervous issues, what he thought of them. Between the first and the second denial letters was when Dr. Hines wrote his letter to Reliance Standard, giving his opinion as to her disability and the causes therefore. Between the first and the second denial letters, specifically in December of 2006, Reliance Standard provided to Mrs. Maurer a copy of Reliance Standard's entire medical record, which at that point included the medical opinions of Dr. Hauptman and of Dr. Shofferman, the pain management specialists, and those were the documents, or those were the reports upon which Reliance Standard based its initial decision to that point. So that I would suggest that Reliance Standard did in fact provide Mrs. Maurer, between the first denial letter and the second denial letter, with all of the information upon which it relied, and it was those medical opinions, particularly the opinions of Dr. Hauptman and Dr. Shofferman, which formed the basis for Reliance Standard's decision. So what they had was... So in your view, handing it over is sufficient without also a cover note saying, in particular, we rely on X and Y? The short answer is yes, and the reason I say that is that the cover letter, if you will, is the denial letter. Mrs. Maurer's husband asked Reliance Standard, what are you basing this on? Where are you getting this mental nervous limitation stuff? Reliance Standard's response was, here is the file. Here are the documents upon which we're basing it. And as I say, that included Dr. Hauptman's report and Dr. Shofferman's report, both of which specifically stated, as is noted, that without the contribution of the psychiatric diagnoses, Mrs. Maurer would be capable of sedentary work activity. So I do believe that those were addressed. What is your response to the question I asked opposing counsel about the order in which we make a decision? And I'm just going to assume this for the sake of argument. If we were to agree with you on the mental nervous limitation, would we have to decide any of the other issues in the case, apart from obviously the level of skepticism that we would apply to whatever the substantive thing is, but do we have to look at the other ground for a decision or not? I don't believe that it would be necessary for the court to reach the other issues. The question that is on review under Conkright v. Frommer is whether the administrator's determination was reasonable. And in making that determination, of course, the court takes into account the conflict of interest and whatever factors there are that would affect the skepticism or lack of skepticism, we would hope, from which the court would review the determination. The definition of disability or each and every, I don't believe, would come into play if the court finds that the application of the mental nervous limitation was proper and therefore Ms. Maurer had been paid the correct amount of benefits without regard to other aspects of the policy language. Okay, thank you. With respect to the definition of disability, counsel raised that so I wanted to address that briefly. This court previously noted in Fenberg v. Cowden that where the policy is issued in a different jurisdiction that California rules of insurance contract interpretation do not apply. In this case, the policy states unequivocally that it was issued and delivered in Rhode Island and is governed by its laws. Appellant in her reply brief asked the fair question, which is, well, what does Rhode Island have to do with this case? And the answer, we think, lies in the documents which we submitted, particularly Supplemental Excerpt of Record, page 2, where it notes that the trust is a Rhode Island trust. So the answer to that question is the insurance policy in this case is issued to the RSL Insurance Trust. And it was issued in 1986, 10 years prior to the date when Ms. Maurer had arranged for her law firm to become a participating member in the trust. In 1986, the policyholder, the RSL Insurance Trust, was domiciled in Rhode Island, and that continues to be true. So that is why the citation to the Wang case isn't dispositive here, and that's why California laws of insurance contract interpretation don't apply, because, simply put, this contract, at the time that it was issued and entered into, was not entered into in California. Briefly with respect to the language of the policy regarding the fact that after 36 months, and I do want to emphasize that it's only after a participant has received benefits for 36 months, does the each and every language apply. It is true. The policy says that after a participant has received benefits for 36 months, they can only continue to receive benefits if they're unable to perform each and every material duty of any occupation. In McClure v. Life Insurance Company of North America, this court noted correctly, we would submit, that each and every means all of the duties associated with the job. Other circuits are in accord. The Sixth Circuit in Carr v. Reliant Standard Life Insurance Company, and the Fourth Circuit in Gallagher v. Reliant Standard Life Insurance Company. We don't believe the language is ambiguous. We think that the language is clear. Now, of course, there should always be a common sense interpretation given to that. Counsel, if I could interject a question. To me, it seems like the definition that total disability requires that they can't do any function of any job is not common sense because lots of jobs have multiple functions. It seems like if you couldn't do one function of some other job, even though, rather, if you could do one function of another job, even though you could never get the job because you couldn't do ten other functions of the job, you're considered not disabled, but in a practical sense, why aren't they disabled if they can't get any job? My response to that, Your Honor, is twofold. One is that the definition itself does require that the individual be unable to perform each and every duty of any occupation for which the individual is reasonably qualified by education, training, and experience. So there is that caveat to it. My second response is that, of course, we would always expect a claims examiner to take a common sense approach to this definition. It's not intended to be as draconian as it sounds in theory because, in practice, what we're actually looking for is what is the insured's physical level of capacity. For example, and we've seen this happen in other cases, where an individual has significant cognitive issues. Well, perhaps they might be able still to show up at the office. Perhaps they might still be able to sign checks or something like that. But as a practical matter, if somebody has significant cognitive deficits, we would expect the decision to be that they are unable to perform any job for which they're reasonably qualified by education, training, and experience because if you have serious mental cognitive deficits, you can't seriously perform the functions of any job. So I do agree with the court that a common sense interpretation of this particular policy definition is required. But it is not meant to be the draconian result such that if somebody is, if somebody has to be in a persistent vegetative state, that otherwise they would be unable to recover benefits. Turning to the specifics of our case in particular, what Reliance Standard was looking at was, does Ms. Maurer have the physical capacity to perform the sedentary occupation? That was what they looked at. They did take a look at issues relating to cognition. Dr. Halton, for example, did note in the records that when Ms. Maurer was being prescribed Neurontin, that she complained of cognitive deficits. And he agreed that during that period of time, she would not have been able to work because of the sequelae of the medication that she was taking. He did note that she only became able to work again once she was off of that medication. So I use that just to point out how the definition is supposed to be applied in real-world terms. It is supposed to look at an individual with a realistic view as opposed to an arbitrary finding that unless somebody is a vegetable that they're not qualified for the benefits. It just seems to me that you might say with a lawyer, one of the essential functions of their job is they have to speak clearly as both you and your adversary do. But still, if they can't understand a stitch of law, they can speak clearly, but what they speak is nonsense. They really are disabled from being a lawyer. But yet it seems that under the definition argued, they wouldn't be disabled because they could do one essential function, they could speak clearly. It's not our intention to argue that the definition is that draconian, Your Honor. We're asking that the definition be applied to the facts and the medical issues at issue in this case in particular. I do not and would not ever argue that a lawyer who can still speak but has cognitive deficits should be considered ineligible to receive benefits under this particular standard. I agree with the Court that that seems excessive. We don't argue that that's the law, and we're not arguing for that standard in this case. Thank you. Thank you, Your Honor. Ms. Gray, you had about two and a half minutes left, I believe. Thank you, Your Honor. I want to point out with respect to the mental nervous limitation and the application or lack of application, no doctor in the file denies that Ms. Moore has fibromyalgia and chronic pain. Every single doctor, including the doctors hired and paid for by RSL, with the exception of Dr. Mahawar. Dr. Mahawar doesn't think she has any physical condition, and he also doesn't think she has any mental health condition. So the only opinion about the presence or absence of a mental health condition in the file is Dr. Mahawar's position. And Dr. Hines's notes. Dr. Hines has not indicated that a diagnosed mental disorder contributes to her disability, and he unequivocally denied that, even though we didn't really understand the basis for the denial because this was before Ms. Moore had been provided the claim file. In fact, the court below took issue with Dr. Hines's failure to rebut the implication that psychiatric issues were contributing to her disability. He was not aware of that, nor was Ms. Moore. They had not been told that yet. What's Dr. Hines's specialty? He is a pain specialist. He is a board-certified psychiatrist, like many pain specialists. He is a psychiatrist as opposed to an anesthesiologist or a PM&R. He doesn't do talk therapy. He refers his patients out who do need talk therapy to... Oh, he refers to many of his sessions as counseling, face-to-face counseling, I think was the term. So do medical doctors, often. Medical doctors often say, I spent 30 minutes counseling with a patient about, you know, chemotherapy. I think if you adopt RSL's position and the lower court's position, then any time there's a reference, as there's apt to be, when you have a person with chronic pain who's grieving the loss of her beloved occupation, there's going to be references to stress, anxiety. There may be depression in her past. If somebody has depression in her past, I'm concerned that sanctioning the lower court's holding will preclude benefits for those people. It seems to me that's where Dr. Birnbaum comes in. He's a board-certified rheumatologist. And what did Dr. Birnbaum say? Dr. Birnbaum, the question asked of Dr. Birnbaum, to me, shows the bias, as it shows that RSL is being deliberately obtuse. He's asked... Pardon me, it was Dr. Schoferman that was asked, without the presence of mental nervous, would this person be capable of work activity? Well, Dr. Birnbaum was a rheumatologist who says he can't... Dr. Birnbaum, I don't know what... Dr. Birnbaum raises more questions than answers. This is what he says. Her symptoms were primarily related to chronic pain and psychiatric dysfunction rather than inflammatory diseases. Well, he conceded she had fibromyalgia, so he conceded she had inflammatory disease. And chronic pain is a symptom. That's not his only conclusion. On the previous page, he says there clearly is a significant element of psychiatric dysfunction in terms of both anxiety and depression. And how does a rheumatologist come to this diagnosis? He's ruling out primarily inflammatory disease, which is his area of expertise. I see you're over your time, so why don't you answer that question and then we'll wrap it up. I don't think he did rule out inflammatory disease. He indicated that he didn't see evidence of it. I'm not sure what you would see from the naked eye. He conceded she had fibromyalgia, which is an inflammatory disease, and he indicated the presence of ankylosing spondylitis was possible. Thank you very much, Herman. Thank you, Ms. Green. Mr. Green, thank you too. The case just argued is submitted.
judges: Silverman, Graber, Gould